IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANNA JOU, et al., | Case No.: C-13-03075 JSC |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. No. 8)** |
| v. | |
| KIMBERLY-CLARK CORPORATION, et al., | |
| Defendants. | |

In this putative class action, Plaintiffs Diana Jou and Jaynry Young allege that the branding and marketing of some of Defendants' Huggies diapers and baby wipes are misleading to consumers. Now pending before the Court is Defendants' motion to dismiss Plaintiffs' Complaint or, in the alternative, motion to strike. Having carefully considered the parties' briefing, and having had the benefit of oral argument on December 5, 2013, the Court grants in part and denies in part the motion.

**ALLEGATIONS OF THE COMPLAINT**

Defendant Kimberly-Clark manufactures Huggies "pure & natural" Diapers and Huggies "Naural Care" Wipes. Regarding the diapers, Defendant markets them as "pure & natural," a phrase which is displayed prominently on the front of the product's packaging. (Dkt. No. 1 ¶ 23.) The front

of the packaging also informs the consumer, without qualification, that the diapers are made of "soft organic cotton." (*Id.*)  In addition, green coloring, trees, and leaves, are displayed on the front of the product's packaging.  This marketing is an attempt to contrast the "pure & natural" diapers with Defendant's other, conventional diaper offerings.  (*Id.* at ¶ 24.)

The "pure & natural" diapers, however, do not differ materially from other of Defendant's diaper products.  The "pure & natural" diapers differ in only two insignificant ways.  First, while the product contains organic cotton, the cotton is only on the outside of the diaper and therefore never actually comes into contact with the ultimate user, the baby.  "As a result, the marketing does not match the reasonable expectation of consumers created by Defendant: that the diaper—in total, not in small, immaterial part—is made of organic cotton." (*Id.* at ¶ 28.)  Second, the "pure & natural" diapers include a liner that "includes some materials that are potentially less harmful to the environment than materials used in traditional diapers." (*Id.* at ¶ 29.)  However, the "pure & natural" diapers also contain "unnatural and potentially harmful ingredients, such as polypropylene and sodium polyacrylate, which are components of Defendant's traditional diapers." (*Id.*)  Nowhere on the packaging does Defendant disclose the actual composition of the diapers, including polypropylene or sodium polyacrylate.

As for the "Natural Care" wipes, the "Natural Care" term is displayed prominently on the front of the packaging, along with green coloring and leaves.  Despite these representations, the "Natural Care" wipes contain two substances, sodium methylparaben and methylisothiazolinone, "that are not natural and that are hazardous." (*Id.* at ¶ 34.)  For example, the European Union has banned sodium methylparaben and the Federal Drug Administration has restricted its use in food and beverages; Canada and Japan restrict the use of methylisothiazolinone in cosmetics.  (*Id.*)

Plaintiffs purchased the diapers and the wipes at a premium in reliance on the marketing described above.  Specifically, "Plaintiff Jou relied on Defendant's false, misleading, and deceptive representations that Huggies Natural Diapers and Huggies Natural Wipes would provide natural, relatively safe, environmentally sound, and (in the case of the diapers) organic alternatives to traditional diaper and wipe offerings." (*Id.* at ¶ 11.)  In addition, "Plaintiff Young relied on Defendant's false, misleading, and deceptive representations that Huggies Natural Diapers would

2

provide natural, relatively safe, environmentally sound, and organic alternatives to traditional diaper offerings." (*Id.* at ¶ 13.)

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. For the Court to exercise proper subject matter jurisdiction over an action, the parties must have standing. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *see also Warth v. Seldin*, 422 U.S. 490, 517-18 (1975) ("The rules of standing . . . are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). "[T]he standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498–99 (internal quotation marks omitted).

Even if a plaintiff adequately alleges standing, a complaint may still be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. A complaint fails to state a claim upon which relief may be granted if the plaintiff fails to allege the "grounds" of his "entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, a court should dismiss a complaint for failure to state a claim if, taking all factual allegations as true, it does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 662; *see also Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1034 (9th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (internal quotation marks omitted).

//
//
//

United States District Court
Northern District of California

**DISCUSSION**

Defendant moves to dismiss all five of Plaintiffs' causes of action.[1]  Defendant contends that the claims, all fraud-based, fail to satisfy the heightened pleading standard for fraud claims contained in Federal Rule of Civil Procedure 9(b).  In addition, Defendant asserts that the claims are implausible and therefore insufficient under Federal Rule of Civil Procedure 12(b)(6).  Finally, Defendant argues that Plaintiffs' Wisconsin-law claims, and the nationwide class based on those claims, should be dismissed and/or stricken.  The court will address each of these issues in turn after addressing the threshold jurisdictional issue of standing.

**A.      Standing**

A "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  Article III standing requires that litigants demonstrate a "personal stake" in the suit.  *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted).  "The party invoking the Court's authority has such a stake when three conditions are satisfied: The petitioner must show that he has 'suffered an injury in fact' that is caused by 'the conduct complained of' and that 'will be redressed by a favorable decision.'"  *Camreta v. Greene*, 131 S. Ct. 2020, 2028 (2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  When ruling on a motion to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."  *Warth*, 422 U.S. at 501.  Nonetheless, the plaintiff has the burden of establishing Article III standing.  *See Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).

In addition to Article III standing, a plaintiff must establish statutory standing to bring claims under the UCL, CLRA, and FAL.  *See* Cal. Bus. & Prof. Code §§ 17204, 17535; Cal. Civ. Code § 1780(a).  These statutes require the plaintiff to show that he or she has suffered an "economic injury."

---

[1]  Plaintiffs' claims are based on violations of the following five statutes: (1) California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-1785; (2) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.; (3) California's Environmental Marketing Claims Act ("EMCA"), Cal. Bus. & Prof. Code §§ 17580-17581; (4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210; and (5) Wisconsin's Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18.

1   *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).  The economic injury requirement

2   under the UCL is "substantially narrower than federal standing . . . which may be predicated on a

3   broader range of injuries."  *Id.* at 324.

4          Defendant first argues that Plaintiffs lack Article III and statutory standing to seek restitution.

5   The Court disagrees.  Plaintiffs allege that they were injured by Defendant's unlawful conduct

6   because they would not have purchased the products if they did not include the alleged

7   misrepresentations.  Plaintiffs further allege that the diapers and the wipes are sold at a premium

8   because they are labeled "natural."  Taking these allegations as true and construing them in the light

9   most favorable to Plaintiffs, Plaintiffs have adequately alleged standing.  *See  Manchouck v. Mondelez*

10  *Int'l Inc.*, 2013 WL 5400285, at *2 (N.D. Cal. Sept. 26, 2013) (finding standing under Article III and

11  the UCL where complaint alleged that "plaintiff paid a 'price premium' because the product claimed

12  to be 'made with real fruit,'" and that "[p]laintiff would not have purchased the two products at that

13  price point absent the alleged misstatements"); *see also Jones v. ConAgra Foods, Inc.*, 912 F. Supp.

14  2d 889, 901 (N.D. Cal. Dec. 17, 2012) (holding allegations "that plaintiffs would not have purchased

15  a product if the product had been labeled accurately is sufficient to establish injury under California's

16  consumer laws"); *see also Kwikset*, 51 Cal. 4th at 329 ("For each consumer who relies on the truth

17  and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic

18  harm is the same: the consumer has purchased a product that he or she paid more for than he or she

19  otherwise might have been willing to pay if the product had been labeled accurately.").

20         Defendant fails to persuade the Court that Plaintiffs' allegations that they paid a premium for

21  the products are inadequate.  Defendant's argument overlooks that Plaintiff's allegations regarding

22  their reliance on the misrepresentations *alone* satisfy the economic injury requirement.  *See Kwikset*,

23  51 Cal. 4th at 329.  Moreover, Defendant's contention that Plaintiffs have not properly demonstrated

24  the value of the product they received in order to be entitled to restitution "conflates the issue of

25  standing with the issue of the remedies to which a party may be entitled.  That a party may ultimately

26  be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing

27  to argue for its entitlement to them."  *Id.* (internal quotation marks omitted).  Finally, Defendant's

28  reliance on *Figy v. Amy's Kitchen, Inc.*, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013) is

1  unhelpful because, unlike here, the plaintiff there failed to allege that he relied on the alleged

2  misrepresentations.

3       Defendant next argues that Plaintiffs lack standing to seek injunctive relief "because they do

4  not allege that they continue to purchase the Products (or that they would resume purchasing them if

5  they were labeled differently)."  (Dkt. No. 8 at 19.)  To establish standing for prospective injunctive

6  relief, a plaintiff must demonstrate that "he has suffered or is threatened with a 'concrete and

7  particularized' legal harm . . . coupled with 'a sufficient likelihood that he will again be wronged in a

8  similar way.'"  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *City

9  of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  A plaintiff must establish a "real and immediate

10  threat of repeated injury."  *Bates*, 511 F.3d at 985.

11       Plaintiffs here do not identify any facts in their Complaint that allege a sufficient likelihood

12  that they will again be wronged in a similar way.  Specifically, Plaintiffs do not identify any allegation

13  that suggests they will purchase the same products again.  Rather, Plaintiffs cite to, among others,

14  *Henderson v. Gruma Corp.*, 2011 WL 1362188, at *8 (C.D. Cal. Apr. 11, 2011), which held that

15  "[w]hile Plaintiffs may not purchase the same Gruma products as they purchased during the class

16  period, because they are now aware of the true content of the products, to prevent them from bringing

17  suit on behalf of a class in federal court would surely thwart the objective of California's consumer

18  protection laws."  *See also Larsen v. Trader Joe's Co.*, 2012 WL 5458396, at *3-4 (N.D. Cal. June 14,

19  2012) (following *Henderson*).  This Court, however, disagrees with *Henderson* to the extent it holds

20  that a plaintiff may seek injunctive relief even if she fails to allege any interest in purchasing the

21  product in the future.  *See Bates*, 511 F.3d at 985; *see also Mason v. Nature's Innovation, Inc.*, 2013

22  WL 1969957, at *4 (S.D. Cal. May 13, 2013) (collecting cases and concluding that "[g]uided by the

23  Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts

24  that hold that a plaintiff does not have standing to seek prospective injunctive relief against a

25  manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the

26  plaintiff would suffer future harm from the defendant's conduct—i.e., the plaintiff is still interested in

27  purchasing the product in question").  As explained in *Ries v. Arizona Beverages USA LLC*, 287

28  F.R.D. 523, 533 (N.D. Cal. 2012), the harm California's consumer protection statutes is meant to

1  redress continues even after a person is aware of a product's deceptiveness: "Should plaintiffs

2  encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they

3  could not rely on that representation with any confidence.  This is the harm California's consumer

4  protection statutes are designed to redress."

5          Thus, while the Court rejects Defendant's suggestion that harm to Plaintiffs cannot continue to

6  the extent they have already discovered the alleged deception, the Court also rejects Plaintiffs'

7  contention that it is unnecessary for them to maintain any interest in purchasing the products in the

8  future.  Placing this requirement on Plaintiffs does not thwart the objective of California consumer

9  protection laws since it is not impossible that a consumer would be interested in purchasing the

10  products at issue if they were labeled correctly.  *See Mason*, 2013 WL 1969957 at *4 ("[I]t is an

11  exaggeration to claim that injunctive relief would never be available in false advertising cases.  There

12  are cases where a consumer would still be interested in purchasing the product if it were labeled

13  properly—for example, if a food item accurately stated its ingredients."); *Ries*, 287 F.R.D. at 532

14  (finding standing to seek class-wide injunctive relief where named plaintiffs had a "stated intent to

15  purchase" the challenged product in the future).

16          Because Plaintiffs fail to identify any allegation in their Complaint that suggests that they

17  maintain an interest in purchasing the diapers or wipes, or both, in the future, Plaintiffs have not

18  sufficiently alleged standing to pursue injunctive relief.  The demand for injunctive relief is dismissed

19  with leave to amend.

20  **B.      Whether Plaintiffs State a Claim**

21          **1.      Rule 9(b)**

22          Plaintiffs concede that their claims are grounded in fraud and therefore governed by Rule

23  9(b)'s heightened pleading standard.  Under Rule 9(b), "in alleging fraud or mistake, a party must

24  state with particularity the circumstances constituting fraud or mistake."  In particular, the complaint

25  must include specificity regarding the charged conduct, including the "who, what, when, where, and

26  how." *Reed v. Wells Fargo Bank*, 2011 WL 4802542, at *3 (N.D. Cal. Oct. 11, 2011).  "[T]he

27  circumstances constituting the alleged fraud must be specific enough to give defendants notice of the

28  particular misconduct . . . so that they can defend against the charge and not just deny that they have

United States District Court
Northern District of California

done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  When

alleging that fraudulent statements were made, a plaintiff must identify the false statements and

indicate why they were false.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

      Defendant argues that the Complaint is deficient under Rule 9(b) because Plaintiffs do not

offer details of "their own purchasing decisions;" rather, "Plaintiffs rely almost exclusively on

conclusory assertions regarding what a generic 'reasonable consumer' would expect and rely upon."

(Dkt. No. 8 at 5.)  The Court is not persuaded.  It is undisputed that the Complaint alleges the who and

when in paragraphs 10-13.  (See Dkt. No. 1 ¶¶ 10-13 (alleging that Plaintiff Jou purchased

Defendant's diapers and the wipes from a Target in Alameda County in October 2011 and that

Plaintiff Young purchased Defendant's diapers from a Target in San Mateo County in September

2011).)  Paragraphs 11 and 13 also include allegations that the Plaintiffs "relied on Defendant's false,

misleading, and deceptive representations" that the products were, among other things, "natural" and

"relatively safe."  (*Id.* at ¶¶ 11-13.)  While it is true that these allegations are not specific as to *what*

representations were false and misleading, *where* those representations were on the packaging, or as to

*how* such representations are fraudulent, those specific allegations are made in paragraphs 20-38

under the "Common Factual Allegations" section.  Defendant does not explain why these specific

allegations are deficient under Rule 9(b).  Thus, although Defendant contends that it is unclear

whether Plaintiffs relied on the same representations that are specifically identified, it is logical to

infer that the specific allegations regarding the what, where, and how of the fraud refer to Plaintiffs'

earlier allegations concerning the "false" and "misleading" representations they relied upon. Plaintiffs

have accordingly satisfied Rule 9(b).  *See Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111,

1126 (N.D. Cal. 2010) (finding Rule 9(b) satisfied where "plaintiffs have identified the particular

statements they allege are misleading, the basis for that contention, where those statements appear on

the product packaging, and the relevant time period in which the statements were used"); *see also*

*Clancy v. The Bromley Tea Co.*, 2013 WL 4081632, at *10-11 (N.D. Cal. Aug. 9, 2013) (same where

"the 'who' is Bromley Tea Company and other defendants; the 'what' is nine discrete types of

unlawful and deceptive claims by Defendants on the labeling and packaging of its products, including

United States District Court
Northern District of California

8

Pure Green Tea and 100% Organic Pure Black Tea, as well as on its website; the 'when' is since 2008 and throughout the class period; the 'where' is Bromley's package labels and website").

Defendant's cited authority is inapposite.  The court in *Pardini v. Unilever U.S., Inc.*, 2013 WL 3456872, at *8 (N.D. Cal. July 9, 2013) held that the plaintiff did not satisfy Rule 9(b) where she alleged that the nutrition panel on the back of a butter product was deceptive, but failed to state that she actually looked at the panel.  Thus, "it [was] implausible that she was deceived by its lack of disclosures."  *Id.*  Here, the alleged fraudulent statements—"pure & natural," "soft organic cotton," "Natural Care"—are all contained on the front of the packaging; Plaintiffs do not allege any misrepresentations on the back of the products.  Because Plaintiffs have alleged that they purchased these products in person at a store, and that they relied on the representations that the products were, among other things, "natural," it is plausible to infer that Plaintiffs looked at and relied upon the alleged misrepresentations on the front of the packaging.  Plaintiffs could not have relied on the representation that the products were "natural" without reading the terms "pure & natural" and "Natural Care."  In addition, *Samet v. Procter & Gamble Co.*, 2013 WL 3124647, at *8 (N.D. Cal. June 18, 2013) is distinguishable because, unlike the court there, this Court has concluded that Plaintiffs have adequately alleged how they were "actually misled," *e.g.*, the wipes were labeled "Natural Care" but contained two non-natural ingredients.  Finally, *Maple v. Costco Wholesale Corp.*, 2013 WL 5885389, at *5-6 (E.D. Wash. Nov. 1, 2013) concerned the plaintiff's failure to plead causation; namely, that he actually read the allegedly fraudulent statements on the drink bottle.  Because the *Maple* court does not discuss Rule 9(b), that case does not support Defendant's contention that Plaintiffs' allegations are deficient under that rule.  After all, the goal of Rule 9(b) is to provide the defendant with notice, not to ensure that the plaintiff has adequately pled causation.  *See Kearns*, 567 F.3d at 1124.

### 2.  Whether Plaintiffs plausibly allege that a reasonable consumer would likely be deceived by the products' labeling

California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The False Advertising Law ("FAL") prohibits any "unfair, deceptive, untrue, or misleading advertising."  *Id.* § 17500.  California's

9

United States District Court
Northern District of California

1  Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or

2  deceptive acts or practices." Cal. Civ. Code § 1770.  California's Environmental Marketing Claims

3  Act ("EMCA") prohibits "any untruthful, deceptive, or misleading environmental marketing claim."

4  Cal. Bus. & Prof. Code § 17580.5(a).  While an "environmental marketing claim" includes "any claim

5  contained in the 'Guides for the Use of Environmental Marketing Claims' published by the Federal

6  Trade Commission." *Id.*  Finally, Wisconsin's Deceptive Trade Practices Act ("WDTA") prohibits

7  the making "to the public" of an advertisement, statement, or representation which "contains any

8  assertion, representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. §

9  100.18(1).

10        As the parties appear to agree for purposes of the present motion, Plaintiffs' four California

11  claims are assessed under the objective standard of the reasonable consumer; namely, Plaintiffs must

12  adequately allege "that members of the public are likely to be deceived."  *Williams v. Gerber Prods.*

13  *Co.*, 552 F.3d 934, 938 (2008) (assessing claims, like Plaintiffs, under the UCL, FAL, and CLRA)

14  (internal quotation marks omitted); *see also Hill v. Roll Intern. Corp.*, 195 Cal. App. 4th 1295, 1304

15  (2011) (holding that plaintiff's EMCA claim must satisfy the reasonable consumer standard "as

16  expressed in the FTC guides and as used in our state's consumer laws [UCL, FAL, CLRA]" (citations

17  omitted)).  Because the parties do not discuss whether the standard differs for Plaintiffs' Wisconsin

18  law claim, the Court will assume for the purposes of this motion that the same reasonable consumer

19  standard applies.

20        "The California Supreme Court has recognized that these laws prohibit not only advertising

21  which is false, but also advertising which, although true, is either actually misleading or which has a

22  capacity, likelihood or tendency to deceive or confuse the public."  *Williams*, 552 F.3d at 938 (internal

23  quotation marks and alterations omitted).  In addition, while "[i]t is true that the primary evidence in a

24  false advertising case is the advertising itself," California courts "have recognized that whether a

25  business practice is deceptive will usually be a question of fact not appropriate for decision on

26  demurrer."  *Id.* (internal quotation marks omitted).  In *Williams*, the Ninth Circuit reversed a district

27  court's dismissal of the plaintiff's false labeling claims, explaining that the facts of that case—

28  namely, the product's packaging—"d[id] not amount to the rare situation in which granting a motion

to dismiss is appropriate." *Id.* at 939.  The *Williams* court distinguished *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995), a case where the Ninth Circuit upheld the dismissal of a UCL action under Rule 12(b)(6).  The *Williams* court observed that the mailer at issue in *Freeman*, which suggested that the recipient had won a million dollars, also included multiple explicit statements that the recipient's prize was conditioned on him having the winning sweepstakes number.  "Thus, it was not necessary to evaluate additional evidence regarding whether the advertising was deceptive, since the advertisement itself made it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Williams*, 552 F.3d at 939.

Defendant argues that "no reasonable consumer" could mistake the "pure & natural" diapers "as anything more than what they are: diapers with both natural and synthetic materials."  (Dkt. No. 8 at 8.)  In addition, Defendant contends that "no reasonable consumer" would conclude that the "Natural Care" wipes are "entirely composed of natural ingredients."  The Court is not persuaded that, as a matter of law, no reasonable consumer could be deceived by the packaging of Defendant's diapers and wipes.

### a) "pure & natural" diapers

Plaintiffs allege that the "pure and & natural" diapers are deceptive in two distinct, though somewhat overlapping, ways: 1) the packaging misrepresents that the diapers are free of unnatural ingredients, and 2) the packaging misrepresents that the diapers, "in total," are made of organic cotton.  The Court discusses each in turn.

### 1) Non-natural ingredients

The packaging for Defendant's "pure & natural" diapers contains representations that could plausibly deceive a reasonable consumer.  The packaging prominently displays the term "pure & natural," which could lead a reasonable consumer to believe that that the product is free of non-natural ingredients when it actually contains polypropylene and sodium polyacrylate.  The reasonable consumer's incorrect belief could be reinforced by the representation on the front of the packaging of "Soft Organic Cotton."  While the diapers do in fact contain some soft organic cotton, only part of the *outside* of the diaper includes the cotton, meaning that the cotton does not touch the baby's skin as the inside, non-natural portions of the diaper do.  In addition, Plaintiffs allege that the front of the

11

United States District Court
Northern District of California

packaging is adorned with a green banner and images of leaves.  This "green" marketing strategy further reinforces the reasonable consumer's belief that the diapers are entirely natural.  Together, the terms "pure & natural" and "Soft Organic Cotton," in the context of product packaging that includes green coloring and images of leaves, plausibly conveys to a reasonable consumer that the diapers are pure and natural and do not contain synthetic ingredients.

Defendant's arguments to the contrary are unpersuasive.  As an initial matter, Defendant appears to concede that if the phrase "pure & natural" was modified to include the word "only," "all," or "100%" the consumer could plausibly be misled.  (*See* Dkt. No. 8 at 9 ("For a consumer to be misled by the Huggies® Pure & Natural Diapers packaging, they would have to commit the same linguistic error as Plaintiffs: *i.e.*, convert the phrase "Pure & Natural" into "*Only* Pure & Natural," "*All* Pure & Natural," or "*100%* Pure & Natural.").[2])  Indeed, several courts—including the Ninth Circuit—have found that similar "all natural" terms can cause confusion.  *See, e.g.*, *Williams*, 552 F.3d at 939 ("Further, the statement that Fruit Juice Snacks was made with 'fruit juice and other all natural ingredients' could easily be interpreted by consumers as a claim that all the ingredients in the product were natural, which appears to be false.");  *see also  Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 WL 2111796, at *5–6 (N.D. Cal. May 26, 2011) (denying motion to dismiss where plaintiff alleged that ice cream labeled "all natural" contained synthetic ingredients);  *Hitt v. Ariz. Beverage Co., LLC*, 2009 WL 449190, at *7 (S.D. Cal. Feb.4, 2009) (denying motion to dismiss where the plaintiff alleged, among other things, that a reasonable consumer would find the "All Natural" labeling on the defendant's drink products, which contained high fructose corn syrup, deceptive).  The question accordingly becomes, why would the use of "all pure & natural" state a claim but not just "pure & natural"?  Although the parties do not cite any case on point, the Court is aware of one recent

---

[2]  Defendant confusingly cites to *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) as being "highly instructive on this point." (*Id.*)  *Astiana* does not distinguish between the terms "natural" and "all natural;" rather, the *Astiana* court simply held that on a motion for class certification plaintiff had failed to produce evidence that showed that "All Natural," as opposed to "Nothing Artificial," had a uniform definition among class members.  To the extent Defendant cites *Astiana* for the proposition that even claims based on the term "all natural" necessarily fail on a Rule 12(b)(6) motion, that argument is rejected since *Astiana* was a class certification motion based on evidence produced in that case beyond the pleadings.  In addition, as discussed above, several courts have found the term "all natural" to be potentially deceptive when used in products that contain non-natural ingredients.

1    case in this District where a court analyzed the phrases "100% Natural," "All Natural," and "Natural"

2    interchangeably in denying the defendant's motion to dismiss.  *See Janney v. Mills*, --- F.Supp.2d ----,

3    2013 WL 1962360, at *1 n.1 (N.D. Cal. May 10, 2013).  At no point in the analysis was the absence

4    of "100%" or "All" from the term "Natural" significant in determining the deceptiveness of the

5    "Natural" representation on the packaging of a granola bar that included synthetic ingredients.

6    Whether one labels a product "natural" or "all natural," the same plausible inference can be drawn—

7    that the product is natural, meaning it is not made with any non-natural ingredients.  While the use of

8    "all" in "all natural" may make the inference *even more* plausible than the inference arising from the

9    use of just "natural," the use of "natural" still provides the plausible inference required to defeat a

10   Rule 12(b)(6) motion.

11           Moreover, at least with the diapers, "natural" is not used standing alone; rather, the diapers are

12   labeled "*pure* & natural."  Similar to "all," "only," and "100%," "pure" emphasizes the natural state of

13   the product—the product's naturalness is pure.   At the hearing on the motion, Defendant argued that

14   the use of "pure" in "pure & natural" could not plausibly represent to a reasonable consumer that the

15   diaper was made of only natural ingredients.  However, Defendant conceded that if the diapers were

16   labeled "purely natural," then a consumer could plausibly expect the diaper to free of synthetic

17   ingredients.  This Court fails to see how, for purposes of a Rule 12(b)(6) motion, a court could

18   correctly conclude that the term "purely natural," but not "pure & natural," stated a claim.

19           Defendant's primary contention is that the unmodified use of "pure & natural" is, at least in

20   the world of consumers, devoid of a well-defined meaning and therefore a claim based on its use is

21   not actionable.  In other words, it is the type of "[g]eneralized, vague, and unspecified assertions [that]

22   constitute 'mere puffery' upon which a reasonable consumer could not rely."  *Annunziato v.*

23   *eMachines, Inc.*, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005).  As the Ninth Circuit explained in

24   *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.*, 911 F.2d 242, 246 (9th

25   Cir. 1990), "[t]he common theme that seems to run through cases considering puffery in a variety of

26   contexts is that consumer reliance will be induced by specific rather than general assertions."

27   Consequently, "[a]dvertising which merely states in general terms that one product is superior is not

28   actionable.  However, misdescriptions of specific or absolute characteristics of a product are

13

1   actionable." *Id.* (internal quotation marks omitted); *see also Consumer Advocates v. Echostar*

2   *Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003) (finding that the descriptions of a satellite

3   television system as possessing "crystal clear digital video" and "CD quality audio" were

4   nonactionable, as the representations were nothing more than "boasts, all-but-meaningless

5   superlatives," and "claim[s] which no reasonable consumer would take as anything more weighty than

6   an advertising slogan").  Here, Defendant fails to provide any explanation, beyond its bald assertions,

7   as to why "pure & natural" is mere puffery.  Even without the use of the word "all" or "100%,"

8   describing a product as "natural" or "pure & natural" is not generalized and vague.  Defendant even

9   acknowledges this when it argues that "pure & natural" accurately represents the composition of the

10  product because the diapers include some natural ingredients.  Thus, the issue is not whether the

11  unmodified use of "pure & natural" is devoid of meaning; it is *which* meaning a reasonable consumer

12  would ascribe to it.  Whether a reasonable consumer would agree with Plaintiffs ("natural" means no

13  non-natural ingredients) or with Defendant ("natural" means at least one natural ingredient among

14  other, possibly non-natural ingredients) or with neither is not a question that can be resolved on a Rule

15  12(b)(6) motion.

16      In support of its puffery argument, Defendant cites to *Rooney v. Cumberland Packing Corp.*,

17  2012 WL 1512106 (S.D. Cal. Apr. 16, 2012), a case where puffery is mentioned only in the court's

18  summary of the law, but not applied in its analysis.  Moreover, the Court fails to see the applicability

19  of *Rooney* to the present case.  In *Rooney*, the court dismissed the plaintiff's claims that the product

20  "Sugar in Raw" misled consumers to believe that the product was raw, unprocessed, and unrefined.

21  The Court concluded that there was no misrepresentation as a matter of law because the sugar was in

22  fact raw, and, in the context of sugar manufacturing, raw sugar does not equate to unprocessed and

23  unrefined sugar.  Thus, because the product did not state that it was unprocessed and unrefined,

24  plaintiff's claims failed.  Thus, *Rooney* has nothing to do with puffery .

25      Defendant also contends that its marketing is non-actionable puffery because "reasonable

26  consumers know" that the term "natural" "is not a literal description of the Products, since diapers and

27  wipes do not spring directly from the ground or grow on trees."  (Dkt. No. 37 at 7-8.)  Defendant's

28  argument, however, is a caricature of Plaintiffs' allegations.  As already discussed above, Plaintiff

1   alleges that consumers would likely be misled in believing that "natural" means the diapers have no

2   non-natural ingredients—not that the diapers are fruits of the earth.

3         Nor is "natural" mere puffery because the Federal Trade Commission ("FTC") has declined to

4   provide "general guidance" on the use of that term.  *See* 75 Fed. Reg. 63552 (2010).  As the FTC

5   explained, it did not provide guidance because it lacked "consumer perception evidence indicating

6   how consumers understand the term 'natural.'"  *Id.*  In addition, the FTC noted that "natural may be

7   used in numerous contexts and may convey different meanings depending on that context."  *Id.*  It

8   does not follow from these statements that the use of "natural" in connection with Defendant's "pure

9   & natural" diapers is not likely to mislead a reasonable consumer; rather, the statement conveys the

10   unremarkable fact that the use of "natural" may be deceptive in some instances, but not in others.

11   Indeed, far from deeming "natural" mere non-actionable puffery, the FTC statement goes on to

12   explicitly warn marketers that the use of "natural" may be deceptive:

> Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers.  *If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.*  Similarly, if, in a given context, a natural claim is perceived by reasonable consumers as a general environmental benefit claim or as a comparative claim (e.g., that the product is superior to a product with synthetic ingredients), then the marketer must be able to substantiate that claim and all attendant reasonably implied claims.

19   *Id.* (emphasis added).

20         Defendant's reliance on *Pelayo v. Nestle USA, Inc.*, 2013 WL 5764644 (C.D. Cal. Oct. 25,

21   2013) does not persuade the Court to the contrary.  Without explanation, the *Pelayo* court concluded

22   that "[g]iven the FTC's findings that the term 'natural' can be used in numerous contexts, it is

23   implausible that 'a significant portion of the general consuming public or of targeted consumers'

24   would be deceived or mislead by the use of the term 'All Natural' on the Buitoni Pastas."  2013 WL

25   5764644 at *5.  As explained above, this conclusion is at odds with basic logic, contradicts the FTC

26   statement on which it relies, and appears in conflict with the holdings of many other courts, including

27   the Ninth Circuit.  This Court accordingly declines to follow *Pelayo*'s holding.

28

1    In addition, Defendant contends that the product packaging "clears up any possible

2    misconception by identifying which components of the diaper are natural." (Dkt. No. 8 at 10.)

3    Specifically, Defendant identifies the statements "Soft Outer Cover With Organic Cotton," "Aloe &

4    Vitamin E," and "Liner Includes Renewable Materials,"[3] which all appear on the back or side panels

5    of the packaging. However, the Ninth Circuit has already rejected a defendant's argument that

6    "reasonable consumers should be expected to look beyond misleading representations on the front of

7    the box to discover the truth from the ingredient list in small print on the side of the box." *Williams*,

8    552 F.3d at 939-40 ("We do not think that the FDA requires an ingredient list so that manufacturers

9    can mislead consumers and then rely on the ingredient list to correct those misinterpretations and

10   provide a shield for liability for the deception. Instead, reasonable consumers expect that the

11   ingredient list contains more detailed information about the product that confirms other

12   representations on the packaging."). Further, at least one court in this District has already applied

13   *Williams* in rejecting the argument that the "natural" representations on the front of the packaging

14   must be viewed in combination with the back of the packaging to resolve any "ambiguity." *See*

15   *Wilson v. Frito-Lay N. Am., Inc.*, 2013 WL 1320468, at *12-13 (N.D. Cal. Apr. 1, 2013) ("[T]he

16   Court finds that Plaintiffs have adequately pled that a reasonable consumer could interpret a bag of

17   chips claiming to have been 'Made with ALL NATURAL Ingredients' to consist exclusively of

18   natural ingredients, contrary to the reality described in the nutrition box. Even though the nutrition

19   box could resolve any ambiguity, the Court cannot conclude as a matter of law, in the context of a

20   Rule 12(b)(6) motion, that no reasonable consumer would be deceived by the 'Made with ALL

21   NATURAL Ingredients' labels." (citations omitted)).

22       As already explained above, Plaintiffs have alleged facts that plausibly suggest that a

23   reasonable consumer would be misled into believing that the "pure & natural" diapers contained no

24   non-natural ingredients. Thus, under *Williams*, Defendant cannot rely on disclosures on the back or

25   side panels of the packaging to contend that any misrepresentation on the front of the packaging is

26   excused. Further, the Court fails to see how the disclosures necessarily inform the consumer that the

27

28   ---
     [3] Defendant, citing to FTC guidelines, also contends that this phrase—"Liner Includes Renewable Materials"—is not deceptive as a matter of law. (Dkt. No. 8 at 11 n.4.) However, because Plaintiffs do not allege that this term is a misrepresentation, the Court need not address the issue.

1  diapers include non-natural ingredients.  Taken together, the phrases "Soft Outer Cover With Organic

2  Cotton" and "Liner Includes Renewable Materials" suggest that the entire diaper is not made of

3  organic cotton; however, the packaging does not disclose what the "Renewable Materials" are or what

4  other ingredients are included in the diapers—such as polypropylene and sodium polyacrylate.  Thus,

5  a reasonable consumer could still believe that the "pure & natural" diapers included only natural

6  ingredients, notwithstanding Defendant's proposed exculpating disclosures.

7  　　　　Defendant insists that *Williams*'s holding is restricted to cases where the ingredient list is

8  correcting "affirmative misrepresentations."  (Dkt. No. 37 at 3.)  The Court disagrees.  As an initial

9  matter, the Court has already concluded that Plaintiffs have stated a claim that the front of the

10  packaging is likely to misrepresent to a reasonable consumer that the diapers contain only natural

11  ingredients; that is, that the packaging includes an affirmative misrepresentation.  Thus, this case falls

12  within even Defendant's reading of *Williams*.  In addition, Plaintiffs' claim is not that the diapers

13  misrepresent that they contain *any* natural ingredients; rather, the claim is that the diapers

14  misrepresent that they contain *only* natural ingredients.  Thus, it is irrelevant that the disclosures

15  "confirm" that the product does indeed contain some natural ingredients or that the disclosures

16  "clarify" which ingredients are natural.

17  　　　　Defendant's reliance on other cases that it asserts have distinguished *Williams* is inapposite.

18  *See Hairston v. S. Beach Beverage Co., Inc.*, 2012 WL 1893818, at *5 (C.D. Cal. May 18, 2012)

19  (finding *Williams* distinguishable where the phrase "all natural with vitamins" was consistent with the

20  ingredient label that listed only natural ingredients and vitamins); *see also Manchouck v. Mondelez*

21  *Int'l Inc.*, 2013 WL 5400285, at *3 (N.D. Cal. Sept. 26, 2013) (distinguishing *Williams* where the

22  representation "made with real fruit" on the front of the packaging was confirmed by the disclosure of

23  fruit puree in the ingredients list; rejecting argument that fruit puree cannot be classified as "real

24  fruit");  *Bruton v. Gerber Prods. Co.*, --- F.Supp.2d ----, 2013 WL 4833413, at *21 (N.D. Cal. Sept. 6,

25  2013) (granting defendant's motion to dismiss where plaintiff failed to explain why a label claiming

26  "that a product is 'Made with 100% Natural *Fruit*' plausibly implies that the entire product—which

27  contains ingredients other than fruit—is free of synthetic ingredients or ingredients not normally

28  expected to be in food"; noting that "[i]f Defendants' labels claimed that the products were '100%

17

United States District Court
Northern District of California

1    natural,' Bruton's allegations might be sufficient"); *Viggiano v. Hansen Natural Corp.*, --- F.Supp.2d

2    ----, 2013 WL 2005430, at *9 (C.D. Cal. May 13, 2013) (dismissing plaintiff's UCL, FAL, and CLRA

3    claims because the defendant's "natural flavors" label conformed to FDA regulations regarding

4    artificial flavoring and any labeling requirement beyond those regulations was preempted); *Arroyo v.*

5    *Pfizer*, Inc., 2013 WL 415607, at *6 (N.D. Cal. Jan. 31, 2013) (distinguishing *Williams* since Arroyo's

6    complaint "d[id] not take issue with the content of Pro Nutrients, but rather with its efficacy"); *Werbel*

7    *ex rel. v. Pepsico, Inc.*, 2010 WL 2673860, at *4 (N.D. Cal. July 2, 2010) (concluding that packaging

8    for "Cap'n Crunch's Crunch Berries" did not misrepresent that the product contained real fruit

9    because the product did not claim it was made with real fruit or that it was nutritious, and because the

10   Crunch Berries were "described as a 'SWEETENED CORN & OAT CEREAL' and shown as

11   brightly-colored balls of cereal that no reasonable consumer would believe [we]re made from real

12   berries"); *Videtto v. Kellogg USA*, 2009 WL 1439086, at *3 (E.D. Cal. May 21, 2009) (rejecting

13   plaintiff's reliance on *Williams* in contending that the packaging for "Froot Loops" misled consumers

14   since the packaging "truthfully depicts that cereal in the shape of multi-colored rings, rings that do not

15   resemble any known fruit" and because "the fanciful use of [the] nonsensical word [Froot] cannot

16   reasonably be interpreted to imply that the Product contains or is made from actual fruit"); *Red v.*

17   *Kraft Foods, Inc.*, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) (granting defendant's motion to

18   dismiss and concluding that packaging that claims that crackers are made with "real vegetables" and

19   depicts images of vegetables is not likely to mislead consumers into believing that the product is

20   healthy and contains a "significant amount" of vegetables).

21      Finally, the California Court of Appeal's decision in *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th

22   1295, 1298-99, 1304-05 (2011) is not on point.  The *Hill* plaintiff contended that a bottle of Fiji water

23   was misleading because (1) its packaging included a "green drop" that inaccurately conveyed to a

24   reasonable consumer that the product was endorsed by a third-party environmental organization, and

25   (2) the packaging invited consumers to visit the website "fijigreen.com."  The *Hill* court dismissed the

26   plaintiff's complaint, reasoning that, while a reasonable consumer would likely view the green drop as

27   referring to the environment, it did not follow that the consumer would also likely view the green drop

28   as an endorsement from a third-party environmental organization.  In addition, the court explained

United States District Court
Northern District of California

that "fijigreen.com" was simply a website that consumers could visit to obtain information on the

defendant's environmental activities; the plaintiff had not alleged that anything on the website was

false or misleading.  Unlike in *Hill*, Plaintiffs here are not alleging that the green leaves on the product

packaging *alone* constitute the product's misrepresentations; rather, as already explained, the green

leaves and coloring are *in addition to* the "pure & natural" and "Soft Organic Cotton" representations

located alongside those images.

### 2) Organic cotton

Defendant contends that it is not plausible that a reasonable consumer would likely be misled

to believe that the diapers were made exclusively of "Soft Organic Cotton."  The Court agrees.  The

front of the packaging includes the statement "Soft Organic Cotton," which is included in the diapers,

albeit on the outside of the diaper where it does not come into contact with the baby's skin.  Contrary

to Plaintiffs' contentions, the phrase "Soft Organic Cotton" does not in any way connote that the

entire diaper is made of only that material; the phrase simply communicates the presence of that

ingredient, which is true.  Whereas the term "pure & natural" at least implicitly represents that the

product is not impure or unnatural, and thus does not contain synthetic ingredients, the same cannot

be said of the term "Soft Organic Cotton."  The latter phrase's negative representation is simply that

there is not no soft organic cotton, which does not suggest the absence of any other ingredient besides

organic cotton.  The Court accordingly grants Defendant's motion to dismiss to the extent Plaintiffs

allege that the diapers are likely to misrepresent to a reasonable consumer that the product is made

entirely of organic cotton.

### b) "Natural Care" wipes

As with the diapers, it is plausible that the packaging for Defendant's "Natural Care" wipes

would likely deceive a reasonable consumer.  The front of the packaging prominently displays the

term "Natural Care" on an image of a green leaf under the name "Huggies."  At least one version of

the product also contains background images of green leaves.  (*See* Dkt. No. 1 ¶ 33.)  By labeling

these wipes as "Natural Care," and superimposing that term on an image of a green leaf, it is plausible

that a reasonable consumer would likely be led to believe that the wipes contained only natural

ingredients.  The "Natural Care" wipes, however, contain two non-natural ingredients that Plaintiffs

United States District Court
Northern District of California

1    allege are hazardous, including one ingredient—sodium methylparaben—that the European Union has

2    banned and that the Federal Drug Administration has restricted in food and beverages.  It is plausible

3    that a reasonable consumer purchasing wipes for his or her baby would rely on Defendant's natural

4    and "green" representations to reasonably conclude that the wipes would offer a natural and toxic-free

5    option among other non-natural conventional wipes.  Accordingly, Plaintiffs have adequately alleged

6    that the "Natural Care" wipes are likely to misrepresent to a reasonable consumer that the product

7    does not contain any non-natural ingredients, particularly toxic synthetic ingredients.

8         Defendant's arguments to the contrary are all rehashings of their contentions with respect to

9    the "pure & natural" diapers discussed above.  For instance, Defendant asserts that the "Natural Care"

10   representation is "not made in a vacuum," and the ingredient list on the back or the side of the

11   packaging explicitly discloses the non-natural ingredients about which Plaintiffs complain.  (Dkt. No.

12   8 at 13.)  However, as already explained above, "reasonable consumers should [not] be expected to

13   look beyond misleading representations on the front of the box to discover the truth from the

14   ingredient list in small print on the side of the box."  *Williams*, 552 F.3d at 939; *see Wilson*, 2013 WL

15   1320468, at *12-13.

16        **3.     Whether Plaintiffs State a Claim under the WDTPA**

17        Defendant argues that Plaintiffs' claim under the WDTPA fails because, pursuant to a choice

18   of law analysis, only California's consumer protection statutes apply to Plaintiffs.  Defendant also

19   contends that dismissal is warranted for the additional reason that Plaintiffs "lack standing" to assert

20   claims under the consumer protection statutes of any state other than California.  (Dkt. No. 8 at 23.)

21   Plaintiffs respond that a choice of law analysis is premature and that Wisconsin's consumer protection

22   law applies in this action because the WDTPA "focuses on where the deceptive label is made and

23   enters the stream of commerce" and Defendant devised and implemented its marketing program from

24   its headquarters in Neenah, Wisconsin.  (Dkt. No. 32 at 19.)

25        Regarding choice of law, the Court is not convinced that such an analysis is an appropriate

26   vehicle for dismissing an individual plaintiff's claim.  While a choice of law analysis appears

27   necessary when determining whether common issues of law predominate in proposed class actions

28   involving class members from different states, *see Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d

581, 589-90 (9th Cir. 2012), this case has not yet reached that stage of litigation.  Further, the Court is aware of no case that holds that an individual plaintiff, under choice of law principles applied on a Rule 12(b)(6) motion, cannot simultaneously, or in the alternative, bring two causes of action under different states' consumer protection statutes.

Defendant's argument that the WDTPA claim should be dismissed for lack of "standing" also misses the mark.  The cases Defendant cites involve class actions where the courts dismissed the named plaintiffs' statutory claims under the laws of numerous states in which the named plaintiffs did not reside.  *See, e.g., Pardini*, 2013 WL 3456872 at *9 (concluding single named plaintiff lacked "standing" to assert violations of other 49 state's consumer protection statute where plaintiff purchased the product in California only).  The rationale underlying this "standing" determination is that the proposed class lacked a representative plaintiff from those other states, and "[a] class cannot assert a claim on behalf of an individual that they cannot represent."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007); *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1163-64 (N.D. Cal. 2009).  The issue here, however, is not that Plaintiffs lack a representative plaintiff from Wisconsin; it is whether Plaintiffs *themselves* can assert a claim under the WDTPA.  While that issue may have been presumed, or not argued, in the cases Defendant cites, it is squarely before the Court here.

Thus the proper question is whether Plaintiffs, who purchased the products at issue in California, have alleged facts that constitute a violation of the WDTPA.  They have not.  Plaintiffs argue that the WDTPA is violated if deceptive marketing is created in Wisconsin and "enters the stream of commerce" from Wisconsin.  (Dkt. No. 32 at 19.)  They further contend that, even as non-Wisconsin residents, they may sue under the statute because they are "person[s] suffering pecuniary loss because of a violation of [the WDTPA]."  (*Id.* (quoting Wis. Stat. § 100.18(11)(b)).)  The plain language of the WDTPA forecloses Plaintiffs' argument:

> No person, firm, corporation or association . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, *in this state*, in a newspaper, magazine or other publication, . . . which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1) (emphasis added).  Contrary to Plaintiffs' argument, the WDTPA does not "focus" on where the deceptive label is made and enters the stream of commerce; rather, the statute forbids the making, publishing, disseminating, circulating, or placing before the public an untrue or misleading advertisement or representation in a newspaper, magazine or other publication *in Wisconsin*.  *See Calnin v. Hilliard*, 2008 WL 336892, at *13 (E.D. Wis. Feb. 5, 2008) ("The scope of Wis. Stat. § 100.18(1) is limited to publications 'in this state.'"); *see also Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 857-58 (D. Minn. 1998) (concluding that similar Minnesota consumer protection statute was limited to misrepresentations made "in this state," and rejecting plaintiff's "tortured argument" that the statute reached defendant's conduct because its "uniform scheme" originated from its home office in Minnesota).  A Wisconsin corporation does not violate the statute if it creates a deceptive label in Wisconsin and then places the label in a publication outside of Wisconsin; the deceptive label must be placed before the public in Wisconsin.  Since Defendant did not violate the WDTPA by selling its products in California and because Plaintiffs have not suffered pecuniary loss because of the placement of the allegedly deceptive products in Wisconsin, Plaintiffs have not stated a claim under the WDTPA.[4]

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Defendants' motion is granted as to 1) Plaintiffs' lack of standing to pursue injunctive relief, 2) Plaintiffs' claims to the extent they allege that the "pure & natural" diapers are likely to misrepresent to a reasonable consumer that they are made entirely of organic cotton, and 3) Plaintiffs' WDTPA claim.  An amended complaint, if any, shall be filed no later than 30 days from the date of this Order.

IT IS SO ORDERED.

Dated: December 10, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

---

[4]  Because Plaintiffs fail to allege a claim under the WDTPA, the Court need not address Defendant's argument that Plaintiffs cannot assert their Wisconsin-law claims as a nationwide class.

United States District Court

Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28